**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONNA CLARK,**

                        **Plaintiff,**               **1:10-cv-1073**
                                                     **(GLS/DRH)**

          **v.**

**JEANINE DOMINIQUE; THOMAS P. DINAPOLI;**
**PAMELA MCMAHON; AL BROOKS; KATHLEEN**
**O'BRIEN NEJAME; PAUL ZONDERMAN; MARY**
**KENT; RICHARD CIULLA; MARK WORDEN;**
**NANCY GROENWEGEN; CAROLINE AHL; J.**
**DENNIS HANNRAHAN; OFFICE OF THE STATE**
**COMPTROLLER; NEW YORK STATE**
**DEPARTMENT OF CIVIL SERVICE; NEW YORK**
**STATE CIVIL SERVICE COMMISSION; NEW**
**YORK STATE EMPLOYEE'S HEALTH SERVICE;**
**CIVIL SERVICE EMPLOYEES ASSOCIATION;**
and **MARIA CONCETTA STEINBACH,**

                           **Defendants.**
_____

**APPEARANCES:**                **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Donna Clark
Pro Se
43 Raymo Street
Albany, NY 12207

**FOR THE DEFENDANTS:**
*State Defendants*
HON. ERIC T. SCHNEIDERMAN      ADRIENNE J. KERWIN
New York State Attorney General     KELLY L. MUNKWITZ
The Capitol                           Assistant Attorneys General
Albany, NY 12224

*Paul Zonderman*
Whiteman, Osterman Law Firm          ROBERT T. SCHOFIELD, ESQ.
One Commerce Plaza                   CHRISTOPHER W. MEYER,
Suite 1900                           ESQ.
Albany, NY 12260                     NORMA G. MEACHAM, ESQ.

*Civil Service Employees Association*
Civil Service Employees Association, DAREN J. RYLEWICZ, ESQ.
Inc.                                 NANCY E. HOFFMAN, ESQ.
143 Washington Avenue
P.O. Box 7125, Capitol Station
Albany, NY 12224

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Pro se plaintiff Donna Clark commenced this action against

defendants Jeanine Dominique, Thomas DiNapoli, Pamela McMahon, Al

Brooks, Kathleen O'Brien Nejame, Mary Kent, Richard Ciulla, Mark

Worden, Nancy Groenwegen, Caroline Ahl, J. Dennis Hannrahan, the

Office of the State Comptroller, the New York State Department of Civil

Service, the New York State Civil Service Commission, the New York State

Employee's Health Service, and Maria Concetta Steinbach (State

defendants), Paul Zonderman, and the Civil Service Employees

Association (CSEA), asserting claims pursuant to Title VII of the Civil

Rights Act of 1964[1]; Titles I,[2] II,[3] and V[4] of the Americans with Disabilities

Act (ADA); the Age Discrimination in Employment Act (ADEA)[5]; the Family

and Medical Leave Act (FMLA)[6]; 42 U.S.C. §§ 1981, 1983, and 1985 for

alleged violations of the First, Fourth, and Fourteenth Amendments of the

United States Constitution; the New York State Constitution; New York

State Civil Service Law; and New York State Human Rights Law

(NYSHRL).[7]  (*See* Compl., Dkt. No. 1.)  Pending are CSEA, Zonderman,

and State defendants' motions to dismiss, (Dkt. Nos. 17, 18, 20), and

Clark's motions to strike defendants' submissions and to amend her

complaint, (Dkt. No. 33).  For the reasons that follow, the defendants'

motions are granted, Clark's motions are denied, and Clark's complaint is

dismissed.

_____

[1]42 U.S.C. § 2000e, *et seq.*

[2]42 U.S.C. § 1211, *et seq.*

[3]42 U.S.C. § 12101, *et seq.*

[4]42 U.S.C. § 12203.

[5]29 U.S.C. § 621, *et seq.*

[6]29 U.S.C. § 2601, *et seq.*

[7]N.Y. EXEC. LAW § 290, *et seq.*

## II.  Background

### A.   Factual History

Plaintiff Donna Clark, a fifty-two year old "half Sicilian, Christian"

woman, was employed by the Office of the New York State Comptroller

(OSC) as a Calculation Clerk I, a tenured position.  (Compl. ¶¶ 5, 10, 34,

Dkt. No. 1.)  Clark allegedly suffers from several disabilities, including post-

concussive syndrome, post-traumatic stress disorder, photophobia, mild

traumatic brain injury, headaches, and word retrieval problems.  (*See id.* at

¶ 35.)  According to Clark, at some point during her employment, she

requested a desk change, which was provided, and a light cover,[8] a chair,

and a different parking spot, which were denied.  (*See id.* at ¶¶ 36, 270

("Reasonable accommodation was never addressed ....").)

On October 26, 2006, Clark took a leave of absence pursuant to

FMLA.  (*See id.* at ¶¶ 128, 191, 289.)  Clark returned to work on December

4, 2006.  (*See id.*)  Upon her return, OSC monitored Clark's computer

activity, which Clark appears to allege was done in retaliation for her taking

a leave of absence.  (*See id.* at ¶ 191.)

---

[8]Clark alleges that unlike "[a]ll other employees [who] had ... light cover[s]," she "was forced to sit under exposed, hot lights ... [that] burned [the] skin on her face, causing blood vessels to break about her face and chest areas."  (Compl. ¶¶ 39-40, Dkt. No. 1.)

On February 27, 2007, Clark "was illegally confined to her cubicle at OSC due to [defendant] Mary Kent verbally attacking [her]." (*Id.* at ¶ 41; *see also id.* at ¶ 56 ("Mary Kent's harassment and abuse ... reache[d] the level of seriousness ...."); *id.* at ¶ 251 ("Mary Kent admits to her aggressive nature.").) According to Clark, this incident was preceded by an incident the previous day, February 26, where Kent, an Employee Retirement System Examiner with OSC, approached Clark and screamed at her, "You are a f*** nut.  Get in your cubicle and do some F***ing work, you nut.  You are scaring people, because you are a f***ing nut." (*Id.* at ¶ 265.)  In response, Clark alleges that she "notif[ied James] Normile, [defendant Jeanine] Dominique, and Gonzalez [that] she would leave the job unless the harassment and tortured [sic] stopped immediately." (*Id.* at ¶ 264.) Clark further alleges that she told Dominique that "she was leaving on March 2, 2007." (*Id.*)

According to Clark, OSC then began taking action against Clark on the basis that "her continued presence on the job would interfere with operations."[9] (*Id.* ta ¶ 43.)  On March 1, 2007, OSC handed Clark a letter

_____

[9]Without any factual elaboration, Clark also alleges that after reporting her coworkers Theresa Ford and Connie Shea for theft of services in August 2006, defendants began targeting her for termination. (*See* Compl. ¶ 46, Dkt. No. 1.)

notifying her of its belief that she was "unfit to perform [her] duties," locked her out of work on an emergency basis,[10] and denied her request for a pre-lockout hearing.[11]  (*See id.* at ¶¶ 10, 44, 77, 91.)  Clark thereafter requested a due process hearing and filed several objections regarding, inter alia, the absence of an emergency that would warrant an immediate, pre-hearing lockout.  (*See id.* at ¶¶ 44, 82, 110.)

On March 12, 2007, Dominique allegedly contacted Employees Health Services (EHS), a unit of defendant New York State Department of Civil Service (DCS), to request that an MMPI-2 personality test be administered to Clark.[12]  (*See id.* at ¶ 81.)  Shortly thereafter, by letter dated March 16, 2007, OSC advised Clark that she was scheduled to

---

[10]At some point, Kent allegedly said to Clark: "Are you leaving?  That's too bad, I'm about to go off this afternoon and you are going to miss it."  (Compl. ¶ 266, Dkt. No. 1.)

[11]Clark vaguely alleges that on March 1, after the lockout occurred, Kent contacted and met with the Albany Police Department (APD) regarding Clark's conduct.  (*See* Compl. ¶¶ 95-96, Dkt. No. 1.)  According to Clark, "Kent's sham call was made in concert with" defendants CSEA and OSC.  (*Id.*)  And although Clark alleges that Kent's complaint to the APD was based on a "fear of retribution" and Clark "committing computer trespass," Clark nonetheless asserts that "Kent's call to the APD was pretextual ... [since Kent] knew or should have known that her actions would cost [Clark] a loss of property that Kent should now pay for."  (*Id.*)

[12]Clark argues that it is illegal for a layperson to make an EHS referral request, and that Dominique's referral request was therefore in violation of the United States Constitution and the ADA.  (*See* Compl. ¶ 81, Dkt. No. 1.)  In conjunction, Clark alleges that defendant Maria Concetta Steinbach, as Director of EHS, acted unconstitutionally by allowing EHS doctors to perform the tests Clark was being referred for with the knowledge that such doctors were unauthorized and such tests impermissible.  (*See id.* at ¶¶ 26, 171.)

undergo a medical examination on March 21, 2007.[13]  (*See id.* at ¶ 84.)

Accordingly, on March 21, Clark reported to the EHS facility and underwent

a series of tests, including an MMPI-2 test, that were administered by John

Wapner, a psychologist, Dr. Nieves, a psychiatrist, and other "clerical

personnel."  (*See id.* at ¶¶ 85-89, 101-103.)  Clark contends, however, that

these tests were impermissible and that Drs. Wapner and Nieves were not

authorized to examine her because they were not selected by the Civil

Service Commission (CSC).[14]  (*See id.*)  Defendant Richard Ciulla, a

medical doctor, subsequently reviewed Clark's records, including the

March 21 examination and test results, and concluded that Clark was unfit

to perform her duties and constituted a danger to OSC.  (*See id.* at ¶¶ 87-

88.)  But, while Clark admits that Dr. Ciulla was properly authorized by

CSC, she nonetheless charges that Dr. Ciulla "abused his badge of

authority and ... is liable to [her] for injuries due to his disparate treatment,

---

[13]According to Clark, this letter "referenced the death of [her] husband in August of 2005, the stabbing that [she] incurred on the property of her employer in 2005, taking an FMLA leave of absence in 2006, and the medical document provided by [Clark's] doctor."  (Compl. ¶ 94, Dkt. No. 1.)  Clark alleges that the letter was based on "vague allegations of fear, ... unknown fears,... anger that [Clark's] name appeared on promotional lists[, and] ... fear based on gossip ... [including Dominique's fabrication that] 'A group of coworkers became so concerned on March 1, 2007 that they contacted the Albany Police.'"  (*Id.*)

[14]In conclusory fashion, Clark asserts that the tests violated New York State law, the ADA, Title VII, and the First, Fourth, and Fourteenth Amendments of the United States Constitution.  (*See* Compl. ¶¶ 87-90, 103, Dkt. No. 1.)

and reckless act of finding [her] unfit without meeting her."[15]  (*Id.* at ¶¶ 88, 99, 105-06, 108; *see also id.* at ¶ 176 ("Dr. Ciulla's finding of unfitness is arbitrary and without merit ... [because h]e never met [with Clark] ....").)  Clark further charges Dr. Ciulla with unlawfully "caus[ing] emails and HIPAA protected doctor's note from [Clark's] primary doctor to be faxed to the Albany County Mental Health Department" in violation of her privacy rights.  (*Id.* at ¶ 104.)  Drs. Wapner, Nieves, and Ciulla's reports and findings were provided to Clark in April 2007.[16]  (*See id.* at ¶ 107.)

From January 10 to December 30, 2008, with the lockout still in place, hearings were held pursuant to § 72 of the New York Civil Service Law regarding Clark's employment status.  (*See id.* at ¶ 115.)  Defendant Paul Zonderman was selected by OSC and Clark to serve as the independent hearing officer.  (*See id.* at ¶ 58.)  However, Clark contends that in addition to delaying the hearing, OSC refused to provide Clark with a complete list of eligible hearing officers.  (*See id.* at ¶¶ 58, 119.)

---

[15]Clark, without explanation, also asserts that defendants Steinbach, New York State Comptroller Thomas DiNapoli, OSC Attorneys Kathleen O'Brien Nejame, Pamela McMahon, Al Brooks, DCS, OSC, and CSEA are equally liable for the "unfit" determination.  (*See* Compl. ¶¶ 88, 103, Dkt. No. 1.)

[16]Clark maintains, though, that defendant Steinbach initially attempted to conceal the reports and other test-related documents.  (*See* Compl. ¶ 217, Dkt. No. 1.)  Clark also seems to challenge the reliability of EHS's MMPI-2 testing materials.  (*See id.* at ¶¶ 218-20.)

The hearings themselves, according to Clark, including the manner in which they were conducted, the testimony that was offered, and the evidence that was admitted, violated her due process rights.  Clark alleges that Zonderman "repeatedly blocked her attempts to submit [certain] evidence," "precluded [her from] engag[ing] in an adversarial hearing," and "denied [her] an opportunity to appear ... to present direct evidence[,] call witnesses[,] ... confront her accusers[,] ... and give direct testimony."  (*Id.* at ¶¶ 59-62, 115, 206-15; *see also id.* at ¶ 108 ("[D]elay and stall tactics were deployed by Pamela McMahon, Paul Zonderman, and Richard Ciulla[] to preclude [Clark] from creating a record and entering evidence.").)  Clark speculates that Zonderman "demonstrated his prejudices against her" both "prior to meeting her by [making] arbitrary and unsubstantiated interim finding[s]," and during the hearings by denying her motion for summary judgment, "ma[king] disparaging remarks against [her]," and engaging in "unilateral communications" with OSC and its agents.  (*Id.* at ¶¶ 66, 108, 118.)  Clark further speculates that Zonderman "acted in concert ... [with] the other defendants ... to take away [her] property without the due process of law."  (*Id.* at ¶¶ 67; *see also id.* at ¶ 78 ("[Defendants] all conspired to deprive [Clark of] an opportunity to defend against the [charges].").)  And

according to Clark's unsubstantiated allegations, "Zonderman withheld his recommendation pending promises by OSC to pay him an inflated amount of over $34,000." (*Id.* at 108; *see also id.* at ¶¶ 156, 186-88, 252.)

With regard to the testimony offered at the hearings,[17] Clark makes various vague and ill-defined assertions against Dominique, Drs. Ciulla and Wapner, OSC Attorney Kathleen O'Brien Nejame, and CSEA representative Mark Unser.  As to Dominique, Clark generally charges that she "blurted out numerous slanderous statements on the record." (*Id.* at ¶ 120.)  As to Drs. Ciulla and Wapner's testimony, Clark reasserts that they lacked authority to perform any tests or make any findings, and accordingly should not have been permitted to testify.  (*See id.* at ¶¶ 137-38.)  Clark also baldly alleges that in exchange for Dr. Wapner's testimony, defendants OSC Attorney Pamela McMahon and EHS Director Maria Concetta Steinbach illegally gave Dr. Wapner a permanent position with the New York State Department of Correctional Services.  (*See id.* at ¶¶ 172-73.)  And as to Nejame and Unser, Clark alleges that Unser testified about an incident in which Unser reported to Nejame that he was

---

[17]Clark alleges without any specifics that, "[b]ased on information and belief, [her] coworkers who refused to make allegations against [her] were targeted, demoted, and otherwise subjected to ... disciplinary procedures."  (Compl. ¶¶ 236, 258, Dkt. No. 1.)

threatened by Clark, who told him "I will take you down; you don't know what your dealing with; don't mess with me."[18]  (*Id.* at ¶¶ 126-30.) Consistent with Unser's account, Nejame testified to the same incident, stating that she was convinced that Unser sincerely felt threatened.  (*Id.*) In fact, Clark admits that Nejame's notes reinforced her testimony, as they include an entry that Unser told Nejame that "Clark thinks I am trying to take her down."  (*Id.*)  Clark contends, however, that the incident Unser and Nejame testified about could not have occurred, and that Nejame and Unser's testimony were therefore false, since it occurred in November 2006, while Clark was out on leave.  (*See id.*)  In addition, Clark alleges, vaguely, that Zonderman impermissibly allowed Nejame to (1) proffer testimony about newspaper entries made by Clark in which she discussed her private and religious beliefs, and (2) submit Clark's diary entries and religious writings into evidence.[19]  (*See id.* at ¶¶ 147-48.)

_____

[18]According to Clark, at some point prior to the lockout, she made complaints to CSEA about the elected union official for "no apparent reason," and that OSC relied on these complaints as an additional basis for its accusations of unfitness.  (*See* Compl. ¶ 271, Dkt. No. 1.)  And Clark contends that this reliance "shows the intent of the union and its elected officials working in concert with the employer to take away [her] property."  (*Id.*)

Clark also alleges that Unser "always said, 'If you want to get rid of someone all you have [to do] is say they are disruptive in the workplace.'"  (*Id.* at ¶ 272.)

[19]With particular incoherence, Clark also makes a series of disjointed references to comments relating to September 11, 2001.  Clark first refers to a conversation Unser testified to in which Clark allegedly stated to Unser, "Oh, boy, look at the plane, the plane flying buy [sic].  I'm afraid the plane will crash into this building like 911."  (Compl. at ¶ 175, Dkt. No. 1.)

At the conclusion of the § 72 hearings, defendant OSC Attorney Al Brooks filed a motion for summary judgment, which Clark labels "illegal" and "fraudulent."[20]  (*See id.* at ¶¶ 20, 116.)

Clark's employment was terminated on July 7, 2009.[21]  (*See id.* at ¶¶ 10, 13.)  She contends that OSC, DCS, and CSEA were all notified of her termination prior to July 7.  (*See id.* at ¶ 52.)  Clark further alleges that in an attempt to prevent her termination, she wrote letters to Greg Hurd and defendants OSC, DCS, CSC, McMahon, Dominique, DCS employee Mark

---

Clark requests that this testimony be "stricken from the hearing record," citing "the appropriate aviation authority" and the fact that "no planes are visible from the area Unser alleges he was standing with [Clark] when she allegedly made this statement." (*Id.*)  Then, Clark cryptically refers to allegations made during the hearing that after she "complain[ed] about ethnic slurs," her "coworkers were rounded up by administration and told to document each and every instance from thereon if they felt [she] was doing anything wrong or acting inappropriately in the workplace." (*Id.* at ¶¶ 132-33.)  Later in her complaint, Clark states, without any context, that "documents turned over to [her] reference planes, turbans, and 911, Taliban." (*Id.* at ¶ 232.)  And Clark also states, "[d]ocuments show that Kent told the employer, 'Clark was bizarre in high school,' ... [and] 'Clark dresses like the Taliban.'" (*Id.* at ¶ 268.)

[20]Clark additionally alleges that Brooks "concealed documents and emails that ... either exonerated [her] from any ... allegation[s] and/or showed conspiracy on the part of the defendants." (Compl. ¶ 151, Dkt. No. 1.)  But, as with her allegation that "Zonderman attempted to conceal ... a document that showed that the defendants conspired with each other to deprive [Clark] of her constitutional rights," (*id.* at ¶ 155), Clark fails to provide any description of the alleged documents' nature or contents.

[21]According to Clark, following her lockout, defendant Nejame, acting pursuant to defendant McMahon's directives, created a backup of Clark's emails.  (*See* Compl. ¶¶ 190, 193, 227-28, Dkt. No 1.)  Clark also alleges that "Dominique and others" accessed and reviewed Clark's correspondence with and personal writings to the EHS building's nurse.  (*See id.* at ¶¶ 260-62.)  Ultimately, upon her termination, Clark's personal emails were allegedly deleted.  (*See id.* at ¶ 189.)  Clark seems to allege that these actions violated her free speech, privacy, and equal protection rights.

Worden, and DCS Commissioner and CSC President Nancy Groenwegen. (*See id.* at ¶ 53.)  Clark contacted CSEA to request legal representation, which CSEA allegedly denied.  (*See id.* at ¶ 54.)

Clark administratively appealed her termination to CSC.  (*See id.* at ¶¶ 55, 157.)  Clark alleges that Worden appeared before CSC, and when asked what caused the delay in holding the § 72 hearings, attributed the delay to scheduling conflicts.  (*See id.* at ¶ 157.)  Clark contends that the delay was actually based on Worden and other defendants' attempts to deprive her of a hearing.  (*See id.* at ¶¶ 157, 170.)  Thus, Worden "acted in concert and as the middle man between [DCS], OSC, [CSEA], and EHS, to deprive [Clark of] her right to be notified of the allegations against her and challenge those allegations in a timely hearing."  (*Id.* at ¶ 234.)

CSC denied Clark's appeal on August 24, 2010.  (*See id.* at ¶¶ 55, 158.)  This denial forms the basis for Clark's due process claims against defendants Worden, Groenwegen, and CSC Commissioners Ahl and Dennis Hannrahan.  (*See id.* at ¶¶ 27-29, 158.)  According to Clark, Groenwegen, Ahl, and Hannrahan "refused to allow her to create a verbatim record," "ignore[d] her statements and documents including several doctors['] statements," and "erroneously abuse[d] their power [by]

stat[ing] in their decision that [Clark's] doctor made no statements as to her fitness." (*Id.* at ¶¶ 178-81.)  And similar to her accusations against Zonderman, Clark alleges that Groenwegen, Ahl, Hannrahan, and Worden relied on "unilateral communications with [OSC representatives] to come up with their unsubstantiated denial." (*Id.* at ¶ 275.)

## B.   Procedural History

On April 1, 2010, Clark filed a complaint with the Equal Employment Opportunity Commission (EEOC).[22]  (*See id.* ¶ 6.)  In June 2010, after dismissing her complaint, the EEOC issued a series of right-to-sue letters to Clark notifying her of the right to file a civil action under Title VII.  (*See id.* at ¶ 7.)  Consequently, on September 7, 2010, Clark commenced this action against defendants.[23]

## III.  Standard of Review

The standard of review under FED. R. CIV. P. 12(b)(6) is well established and will not be repeated here.  For a full discussion of the standard the court refers the parties to its decision in *Ellis v. Cohen &*

---

[22]Clark hollowly contends that the affidavit submitted by defendant McMahon to the EEOC contains "distortions" and was "pretextual."  (Compl. ¶ 154, Dkt. No. 1.)

[23]Prior to filing the present action, Clark commenced an action in this court on June 23, 2009, in which she asserted substantially the same claims that she is now asserting here.  *See Clark v. N.Y. State Office of the State Comptroller*, No. 1:09-cv-716.

*Slamowitz, LLP*, 701 F. Supp. 2d 215, 217-18 (N.D.N.Y. 2010).

## IV. <u>Discussion</u>

## A. <u>Absolute Immunity</u>

Defendant Zonderman contends that as a quasi-judicial officer he is absolutely immune from suit for the conduct alleged by Clark.  (*See* Zonderman Mem. of Law at 5-14, Dkt. No. 18:1.)  The court concurs.

It is well settled that quasi-judicial immunity is absolute if the official's role "is 'functionally comparable' to that of a judge."  *See Butz v. Economou*, 438 U.S. 478, 513 (1978); *see also Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985) ("Absolute immunity flows not from rank or title or location within the Government, but from the nature of the responsibilities of the individual official." (internal quotation marks and citation omitted)); *Gross v. Rell*, 585 F.3d 72, 81 (2d Cir. 2009) ("Judicial and quasi-judicial immunity are both absolute immunities." (citations omitted)).  In evaluating whether an official's duties are "functionally comparable" to those of a judge, courts should consider a host of factors including the following:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of

15

precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 202 (citing *Butz*, 438 U.S. at 512).

Here, the court is more than satisfied that Zonderman, in his role as an independent hearing officer pursuant to N.Y. Civ. Serv. Law § 72, is entitled to absolute immunity.  As Zonderman outlines in detail, (*see* Zonderman Mem. of Law at 7-12, Dkt. No. 18:1), all of the relevant factors weigh heavily in favor of categorizing § 72 hearings as quasi-judicial and granting hearing officers absolute immunity for actions performed in that role.  *See Sassower v. Mangano*, 927 F. Supp. 113, 120 (S.D.N.Y. 1996) ("[Q]uasi-judicial immunity ... bars claims against administrative law judges and hearing examiners performing judicial functions ...." (citation omitted)); *see, e.g.*, *Bohmer v. New York*, 684 F. Supp. 2d 357, 363-65 (S.D.N.Y. 2010) (holding that New York State Police disciplinary hearing was quasi-judicial in nature and that state officers acting in the role of judge or prosecutor are entitled to absolute immunity).  And as to the acts and omissions that Clark attributes to Zonderman—which at the threshold are woefully unsubstantiated and conclusory—such alleged acts and omissions are insufficient to strip off the protections of absolute immunity.  *See*

16

*Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) ("[A] judicial act does not become less judicial by virtue of an allegation of malice or corruption of motive." (internal quotation marks and citation omitted)); *Tucker v. Outwater*, 118 F.3d 930, 932 (2d Cir. 1997) ("The cloak of immunity is not pierced by allegations of bad faith or malice, even though unfairness and injustice to a litigant may result ...." (internal quotation marks and citations omitted)); *Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) ("[S]ince absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." (citations omitted)); *see, e.g.*, *Wetzel v. Town of Orangetown*, No. 06 Civ. 6117, 2010 WL 743039, at *5-6, 14-15 (S.D.N.Y. Mar. 2, 2010) (finding hearing officer entitled to absolute immunity despite allegations of bribery, bias, "sham" hearings, and conspiracy).  Lastly, to the extent that Clark is contending that Zonderman lacked jurisdiction to preside over and conduct the § 72 hearings, make rulings related to the hearings, and issue final recommendations and findings, such a contention is rejected as baseless and without merit.  *See Tucker*, 118 F.3d at 933; *see, e.g.*, *D'Agostino v.*

17

*N.Y. State Liquor Auth.*, 913 F. Supp. 757, 765-66 (W.D.N.Y. 1996) (rejecting challenge to administrate law judge's jurisdiction based on allegations that he exceeded his authority, acted ultra vires, and made erroneous rulings).

Therefore, having found defendant Zonderman entitled to absolute immunity—and for additional reasons, which are discussed below—the court dismisses all claims against him.  Likewise, the claims against defendants Groenwegen, Ahl, and Hannrahan are dismissed, since, according to Clark's allegations, they simply served on the body of the CSC that reviewed—and denied—Clark's August 24, 2010 appeal.

**B.    Section 1983**

**1.    Facial Challenge to Section 72**

Up front, Clark asserts a facial challenge to the constitutionality of New York Civil Service Law § 72, largely in reliance on *Laurido v. Simon*, 489 F. Supp. 1169 (S.D.N.Y. 1980), and *Snead v. Dep't Soc. Servs. of N.Y.*, 355 F. Supp. 764 (S.D.N.Y. 1973).  (*See* Compl. ¶¶ 1, 182-184, 194-95, 222, 224, 311-13, Dkt. No. 1.)  The court rejects this challenge in light of the amendments made to § 72 subsequent to the *Laurido* decision.  The court is satisfied that the current version of § 72 provides sufficient notice

and hearing requirements that must be met before a tenured employee is placed on involuntary leave.  *See* N.Y. CIV. SERV. LAW § 72(1); *see also Sheeran v. N.Y. State Dep't of Transp.*, 68 A.D.3d 1199, 1200 n.1 (3d Dep't 2009); *Richardson v. Cnty. of Suffolk*, 151 Misc.2d 378, 382 (N.Y. Sup. Ct. 1991).

## 2.    Due Process Claims

The defendants all seek dismissal of Clark's due process claims, including all of her claims relating to the § 72 proceedings, based on Clark's failure to commence an Article 78 proceeding to challenge the § 72 hearings and her consequent termination.  (*See* CSEA Mem. of Law at 6-7, Dkt. No. 17:2; Zonderman Mem. of Law at 16-17, Dkt. No. 18:1; State Defs. Mem. of Law at 4, Dkt. No. 20:1.)  Clark admits that she never availed herself of Article 78's auspices, but asserts that "an [A]rticle 78 appeal would be futile as [her] constitutional rights have been violated and her property was taken away with[out] the due process of law," that "[a]n Article 78 would be an action in futility," and that she "is not required to pursue any remedies she believes are ineffective."  (Compl. ¶¶ 9, 11-12, Dkt. No. 1.)

Assuming that the interests advanced by Clark as the basis for her due process claims are protected by federal or state law, *see Green v.*

19

*Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995), her claims must fail as there can be

no Due Process Clause violation "so long as the State provides a

meaningful postdeprivation remedy."  *Hellenic Am. Neighborhood Action*

*Comm.* (*HANAC*) *v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996)

(citation omitted).  In New York State, an Article 78 proceeding provides an

avenue of postdeprivation redress that satisfies due process requirements.

*See Gudema v. Nassau Cnty.*, 163 F.3d 717, 724 (2d Cir. 1998); *see also*

*Vargas v. City of New York*, 377 F.3d 200, 208 (2d Cir. 2004) ("[A]n Article

78 proceeding ... provides a meaningful remedy where violations of due

process by a ... governmental entity are alleged." (citation omitted));

*HANAC*, 101 F.3d at 881 ("An Article 78 proceeding is adequate for due

process purposes even though the petitioner may not be able to recover

the same relief that [she] could in a § 1983 suit." (citation omitted)).  "[I]t

matters not whether a plaintiff actually avails [her]self of the state court

post-deprivation process.  So long as that process is available, a due

process claim must be dismissed."  *Longo v. Suffolk Cnty. Police Dep't*,

429 F. Supp. 2d 553, 560 (E.D.N.Y. 2006) (citations omitted).  In other

words, "there is *no* constitutional violation (and no available § 1983 action)

when there is an adequate state post-deprivation procedure to remedy a

random, arbitrary deprivation of property or liberty."  *HANAC*, 101 F.3d at 882 (citations omitted).  Thus, all public employees "must invoke [A]rticle 78 to review [adverse actions] that are allegedly arbitrary, capricious, or prohibited by statute or the constitution."  *Finley v. Giacobbe*, 79 F.3d 1285, 1292 (2d Cir. 1996); *see also* N.Y. C.P.L.R. § 7803(3) ("[Q]uestions that may be raised in a proceeding under this article [include] ... whether a determination was made in violation of lawful procedure, ... or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed ....").

Upon review of the relevant provisions of the New York State Civil Service Law, and in light of Clark's allegations and admissions, the court finds that because Clark failed, without legitimate exception, to pursue an Article 78 proceeding—which was both available and more than adequate in light of the interests asserted and the actions alleged—she may not maintain a civil action for deprivation of her property without due process. *See, e.g.*, *Ifill v. N.Y. State Ct. Officers Ass'n*, 655 F. Supp. 2d 382, 390-91 (S.D.N.Y. 2009).  Clark's bald, conclusory assertions of futility do not

excuse her failure to exhaust State remedies.[24]   Therefore, the court

dismisses her due process claims and her claims under New York State

Civil Service Law.

**3.   Equal Protection Claim**

Aside from an initial reference to the Equal Protection Clause, (*see*

Compl. ¶ 1, Dkt. No. 1), Clark does not allege facts sufficient to give rise to

an equal protection violation.  While she does allege that she has

disabilities "that are recognized under the ADA as qualifying disabilities ...

includ[ing] post concussive syndrome, post traumatic stress disorder,

photophobia, ... headaches[, and] ... mild traumatic brain injury," (*id.* at ¶

35), Clark at no point alleges that these alleged disabilities, or any other

impermissible consideration, served as the predicate for any of the

defendants' alleged misconduct.[25]   Nor does Clark identify other similarly

---

[24]The court rejects Clark's general, unsupported contention that "[f]ailure to exhaust state remedies is no bar to this suit, since it is a civil rights action to assure enforcement of the judgment." (Compl. ¶ 281, Dkt. No. 1.)  To the contrary, it is well settled that an Article 78 proceeding *is the process* available and therefore does not give rise to exhaustion concerns or otherwise "contraven[e] the general rule that exhaustion is not required for § 1983 claims." *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169 (2d Cir. 2001) (citations omitted); *see also Lawrence v. Antonucci*, 144 F. App'x 193, 194 (2d Cir. 2005); *HANAC*, 101 F.3d at 881.

[25]Because Clark's discussion of her disabilities seems to be limited to her requests for reasonable accommodations and OSC's provision of certain accommodations and denial of others, (*see* Compl. ¶¶ 35-40, Dkt. No. 1), these allegations will be evaluated more fully in the context of her ADA claim.

22

situated individuals compared to whom she was selectively treated.  *See LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir.1980).  Clark's only references to "discrimination" or "disparate treatment" are made gratuitously and in the context of her allegations regarding the § 72 hearings and her due process deprivations.  (*See* Compl. ¶¶ 111-12, 187, 197, 214, 227, 252, Dkt. No. 1.)  Accordingly, Clark's equal protection claim is dismissed.

**4.    Remaining Constitutional Claims**

To the extent that Clark's remaining constitutional claims brought pursuant to § 1983 for retaliation and violation of her free exercise and privacy rights are directly linked to and generally indistinguishable from her due process claims, (*see* Compl. ¶¶ 46, 73, 81-90, 92, 102-08, Dkt. No 1), these claims are subject to dismissal as a result of her failure to commence an Article 78 proceeding.  *See Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 468-69 (2d Cir. 2006) (holding that plaintiff must exhaust state remedies where her constitutional claims are "inextricably intertwined with the question of whether the state afforded her procedurally adequate process"); *Cecos Int'l, Inc. v. Jorling*, 895 F.2d 66, 71 (2d Cir. 1990) ("[T]he question of whether the statute has been *applied* in an unconstitutional

fashion may be raised directly in an Article 78 proceeding." (citations omitted)); *Christ the King Reg'l High Sch. v. Culvert*, 815 F.2d 219, 224-25 (2d Cir. 1987) (holding that First Amendment issues "may be decided in an Article 78 proceeding); *see, e.g.*, *Katz v. Klehammer*, 902 F.2d 204, 207 (2d Cir. 1990); *cf., e.g.*, *Dorsett-Felicelli, Inc. v. Cnty. of Clinton*, 349 F. Supp. 2d 355, 363 (N.D.N.Y. 2004); *Gasparo v. City of New York*, 16 F. Supp. 2d 198, 213 (E.D.N.Y. 1998).  But insofar as the factual basis for these claims does not entirely overlap with the § 72 hearings and related events, the court finds that such claims fail on the pleadings.

Clark's First Amendment retaliation claim is facially deficient for her failure to "advance non-conclusory allegations establishing ... that the speech or conduct at issue was protected ... [or] that there was a causal connection between the protected speech and [her termination]." *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) (citations omitted), *abrogated on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).  Clark alleges, without any meaningful detail, that she was terminated in "retaliation for whistleblowing, and reporting and documenting what [she] believed were illegal acts on the part of the employer."  (Compl. ¶ 124, Dkt. No. 1; *see id.*

at ¶ 139 ("[P]rior to being put out under Section 72.5[, Clark] exclusively made a number of reports to OSC investigation.").)  According to Clark, she "made reports to OSC investigations starting around August 2006 regarding theft of service by Theresa Ford," and that "[t]hese reports in part caused the defendants to target [her], resulting in [her] loss of property, liberty and due process rights."  (*Id.* ¶ 46.)  Likewise, Clark "reported that Connie Shea accessed her ex-husband's folder, and a theft of services in general."  (*Id.*; *see id.* at ¶ 139 ("One of [Clark's] complaints alleged that Connie Shea had illegally ordered or caused to be ordered her ex-husband's retirement folder, committing the illegal act of computer trespass, a chargeable crime ....").)  These allegations simply consist of vague factual predicates and conclusory labels.[26]  Accordingly, the court

––––––––––––––––––

[26]To engage in constitutionally protected speech, the plaintiff must have spoken as a citizen on "on a matter of ... political, social, or other concern to the community."  *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (internal quotation marks and citations omitted).  "[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment."  *Connick v. Myers*, 461 U.S. 138, 140 (1983); *see also Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979) (holding that First Amendment protects public employee's right to communicate privately or publicly with his employer).  "Government employees are often in the best position to know what ails the agencies for which they work."  *Waters v. Churchill*, 511 U.S. 661, 674 (1994).  However, "a statement by a government employee complaining about nothing beyond treatment under personnel rules," *Garcetti v. Ceballos*, 547 U.S. 410, 428 (2006), or "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of [her] employment," *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999), does not implicate the First Amendment.  Ultimately, "[w]hether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record."  *Id.* at 163 (citation omitted).  While motive is not dispositive in deciding whether the speech addresses a matter of public concern, the court

dismisses Clark's First Amendment retaliation claim.

The same goes for Clark's First Amendment freedom of religion claim.  To prevail on a free exercise claim, a public employee must "show that a state action sufficiently burdened [her] exercise of religion." *Genas v. State of N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 831 (2d Cir. 1996) (citing *Sherbert v. Verner*, 374 U.S. 398, 403 (1963)).  An individual may not be forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand."  *Sherbert*, 374 U.S. at 404.  At a minimum, an employee must allege that the state action discriminated "against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 532 (1993).   Clark's lone allegation is that "Zonderman inflict[ed] his religious beliefs on [her], in allowing Nejame to testify ... that [Clark] was communicating with her deceased husband, through the memoriam pages of the Times Union ...

---

should consider "whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose."  *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009) ("[I]t does not follow that a person *motivated* by a personal grievance cannot be speaking on a matter of public concern.").

and enter [Clark's] private diary entries into evidence, and religious

writings, and prayers." (Compl. ¶¶ 147-48, Dkt. No. 1; *id.* at 69-70

(demanding that judgment be entered "[d]eclaring that the defendants

seizing and disbursing [Clark's] private diary entries and religious writings

... and distributing same, was in violation of [her] First Amendment ... rights

to ... freedom of protected speech, and press, and religion").)  Aside from

identifying Clark as a "Christian," (*id.* at ¶ 34), the complaint is entirely

devoid of any explanation about the substance of Clark's religious beliefs,

the contents of her "religious writings," or how any of the defendants'

conduct burdened her exercise of religion.  Nor does the complaint proffer

any basis from which to infer that any of the defendants discriminated

against her based on her or their religious beliefs.  Clark's claim appears to

be that during the § 72 hearings, OSC and its representatives introduced

evidence of her personal writings—in which she discussed her religious

views—and Zonderman admitted these writings into the record, and that

these actions violated her free exercise rights.  Such a claim fails to

implicate any free exercise concerns and, rather, merely amounts to an

evidentiary issue reviewable under the due process framework.

Consequently, the court dismisses Clark's free exercise of religion claim.

Lastly, Clark's claim that the defendants violated her privacy rights is equally infirm.  First, as to the contents of Clark's personnel file and the "personal" writings and emails that were recovered from Clark's workstation and computer, Clark neither asserts how such documents beget a "legitimate expectation of privacy," *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457-58 (1977), nor alleges any facts to suggest that these documents were unlawfully disseminated outside of OSC, EHS, and the § 72 hearings. Second, insofar as Clark's privacy claim is premised on her being examined by Drs. Wapner and Nieves—neither of whom are named defendants—her claim fails because "[a government] employer may direct [an] employee to undergo a medical examination ... [w]here [the] employer has reason to question whether [the] employee is medically fit to work." *O'Connor v. Pierson*, 426 F.3d 187, 202 (2d Cir. 2005) (citations omitted); *see also* N.Y. CIV. SERV. LAW § 72 ("[T]he appointing authority may require [its] employee to undergo a medical examination to be conducted by a medical officer selected by the civil service department ... having jurisdiction."); *Leonard v. Sugarman*, 466 F.2d 1366, 1366-67 (2d Cir. 1972).  The same goes for the aspect of Clark's claim that her rights were violated when Dr. Ciulla requested and received information from Clark's

primary doctor, (*see* Compl. ¶¶ 104-07, 137, Dkt. No. 1), since the

employer "may direct the employee ... to provide the examining doctor with

relevant medical records."  *O'Connor*, 426 F.3d at 202 (citations omitted).

Clark does not allege that her medical records or the results of the tests

were disclosed to anyone other than these medical examiners and EHS

personnel or that these medical examiners testified at the § 72 hearings to

anything other than Clark's fitness.  *See id.*  Instead, Clark strangely

contends that Drs. Wapner and Nieves were not properly appointed

doctors, (*see* Compl. ¶¶ 68, 85-89, 106, Dkt. No. 1), and contests the

accuracy and reliability of the tests they performed, (*see id.* at ¶¶ 171, 218-

20).  The latter contention is irrelevant, and the former contention is belied

by Clark's admissions that *at OSC's request* Drs. Wapner and Nieves

examined Clark *at EHS.*  Additionally, as defendants point out, it was Clark

who "requested a hearing to challenge her March 1, 2007 placement on

involuntary leave, thereby putting her mental fitness at issue ... for

purposes of determining whether [her] removal ... was proper."  (State

Defs. Mem. of Law at 6, Dkt. No. 20:1.)  Therefore, Clark's privacy rights

claim is dismissed as factually and legally unsustainable.

**5.    Conspiracy Claims**

As to Clark's charges of conspiracy, aside from a series of conclusory, general, and implausible allegations and suppositions that all of the defendants conspired to violate her various constitutionally protected rights, Clark has failed to plead any facts demonstrating that any of the defendants entered into an agreement or reached an understanding to willfully deprive Clark of any such rights. *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) ("To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant acted in a wilful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated the plaintiff's rights ... secured by the Constitution or the federal courts." (internal quotation marks and citation omitted)); *see also Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *see, e.g.*, *Duff v. Coughlin*, 794 F. Supp. 521, 525 (S.D.N.Y. 1992).  Nor has Clark alleged facts sufficient to enable the court to infer a conspiracy.  Therefore, Clark's claims of conspiracy are dismissed.  For like reasons, Clark's claims under 42 U.S.C. § 1985 are dismissed.  *See Dacey v. Dorsey*, 568 F.2d 275, 277 (2d Cir. 1978).

**6.     Eleventh Amendment Immunity**

In the alternative, even if Clark had alleged an actionable constitutional violation, her claims against defendants OSC, DCS, CSC, and EHS would be subject to dismissal, as would her claims against defendants Dominique, DiNapoli, McMahon, Brooks, Nejame, Kent, Ciulla, Worden, Groenwegen, Ahl, Hannrahan, and Steinbach in their official capacities.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 509 (2d Cir. 2006); *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 414 (2d Cir. 1999).

Likewise, with regard to any claims asserted against these defendants under the New York State Constitution, such claims would be subject to dismissal under New York State's sovereign immunity, which bars state constitutional claims against the state, its agencies, or against its employees in their official capacity, regardless of the relief sought.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105-06 (1984), *overruled in part on other grounds*, *Will*, 491 U.S. 58; *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 604 (2d Cir. 1988); *Diamond v. Pataki*, No. 03 Civ. 4642, 2007 WL 485962, at *7 (S.D.N.Y. Feb. 14, 2007).

**7.     Personal Involvement and State Actor Status**

Also in the alternative, Clark's claims against defendants DiNapoli, as New York State Comptroller, and Groenwegen, as DCS Commissioner, are dismissed for lack of personal involvement.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also McKinnon v. Patterson*, 568 F.2d 930, 935 (2d Cir. 1977) ("The fact that [a defendant] was in a high position of authority is an insufficient basis for the imposition of personal liability." (citation omitted)).

Clark's claims against defendants Kent and CSEA fail as neither defendants constitute state actors under § 1983.  First, Clark's allegations make clear that Kent was simply a coworker who, without any actual supervisory authority or power to compel or take official action, harassed and accosted Clark in the workplace.  Thus, Kent was not acting under color of law and cannot be liable under § 1983.  *See Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996); *see, e.g.*, *Petrosky v. N.Y. State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 63 (N.D.N.Y. 1999).  Second, Clark's allegations against CSEA—extremely thin as they are—fail to allege any basis to treat CSEA as a state actor under § 1983, *see Rivas v. N.Y. State Lottery*, 53 F. App'x 176, 177 (2d Cir. 2002) ("The Civil Service

Employee Association is not a 'person' as is required for suits brought pursuant to § 1983." (citations omitted)), let alone any basis to conclude that CSEA acted in concert with a state actor, *see Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).

**C.    Title VII, ADA, ADEA, and FMLA Claims**

**1.    Individual Liability, Employer Liability, and Union Liability**

As a preliminary matter, the court notes that "individuals are not subject to liability under Title VII." *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam) (citation omitted).  Likewise, there is no right of recovery against individuals under the ADEA, *see Martin v. Chem. Bank*, 129 F.3d 114 (2d Cir. 1997) (unpublished); *Romand v. Zimmerman*, 881 F. Supp. 806, 811-12 (N.D.N.Y. 1995); or under the ADA for claims of wrongful termination and retaliation, *see Spiegel v. Schulmann*, 604 F.3d 72, 79-80 (2d Cir. 2010); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Accordingly, Clark's Title VII, ADA, and ADEA claims against defendants Dominique, DiNapoli, McMahon, Brooks, Nejame, Kent, Ciulla, Worden, Groenwegen, Ahl, Hannrahan, Steinbach, and Zonderman are dismissed. And while individual public employees may be amenable to suit under the FMLA if they qualify as an employer under 29 U.S.C. § 2611(4)(A)(ii)(I)

33

such that they had "substantial control over the aspect of employment

alleged to have been violated," Clark has failed to allege that any of the

individual defendants exercised any control over her FMLA right to take a

leave or to return to her position.  *Johnson v. A.P. Prods., Ltd.*, 934 F.

Supp. 625, 629 (S.D.N.Y. 1996) (citation omitted); *see also Smith v.

Westchester Cnty.*, --- F. Supp. 2d ----, No. 09-CV-5866, 2011 WL 570141,

at *17 (S.D.N.Y. Feb. 15, 2011).  Instead, without any particularized or

individualized allegations, Clark sporadically suggests that her employer

"chang[ed] the conditions of her employment," locked her out, commenced

the § 72 hearings, and administered the medical examinations in

"retaliation for taking an FMLA," and that "the employers [sic] case was

fabricated and made up punitively for Clark taking an FMLA leave."[27]

---

[27]Strangely, the most coherent explanation of the circumstances after Clark returned from her FMLA leave comes in what appears to be a letter sent by her to DiNapoli, which Clark inserts into her complaint after paragraph 289 and wherein she discusses how her supervisor, Robert McCauslin, advised her that new procedures had been put into place, that her duties had changed, and that her assignments were being reduced. The relevant portion of that letter reads as follows:

Upon my return on December 4th 2006, there was a copy of Section 72 [Civil Service Law] placed on my desk[, which was followed by] an inter-office memorandum issued to me by my immediate supervisor, Robert McCauslin[,] on February 6th, 2007, ... wherein he takes away more of my job assignments....
Upon my return to work ..., I was notified that new procedures were in effect and my duties at that point were changed.  The retaliation issue was ... addressed in an email correspondence between Bob McCauslin and myself regarding this no retaliation issue when he issued me [the] inter-office memorandum ... in which he states there would be a further reduction in my job assignment due to changes within the department and these changes were not

(Compl. ¶¶ 38, 124, 138, 273, 297, Dkt. No. 1; *see also id.* at ¶ 191 (alleging that her computer was being monitored and accessed after she returned from FMLA leave).)  Consequently, Clark's FMLA claims against defendants Dominique, DiNapoli, McMahon, Brooks, Nejame, Kent, Ciulla, Worden, Groenwegen, Ahl, Hannrahan, Steinbach, Zonderman, and CSEA are dismissed.[28]

In addition, as it is patently clear from Clark's pleadings that OSC is her employer, (*see id.* at ¶¶ 8, 10, 13, 42, 49, 126, 142, 210, 227, 243, 275), the court dismisses Clark's Title VII, ADA, ADEA, and FMLA claims against DSC, CSC, and EHS.  Furthermore, because the Eleventh Amendment bars claims for money damages against state agencies under the ADEA, *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000), or under Title I of the ADA, *see Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S.

---

in retaliation.

(Compl. at 61-62, Dkt. No. 1.)

    [28]Although they are not listed in the caption of the complaint, it appears that Clark is also attempting to assert claims against Danny Donohue, Denise Lawyer, Mark Unser, and Steven Crain.  (*See* Compl. ¶ 16, Dkt. No. 1 ("Danny Donohue, is being sued in his individual and official capacities, Denise Lawyer, Mark Unser, Steven Crain.").)  Any claims against these individuals are legally and factually inoperative.  First, as to Donohue and Crain, the complaint is devoid of any further reference to either individual.  Second, the lone mention of Lawyer is meaningless: "Dennis [sic] Lawyer, CSEA, appeared with Kent."  (*Id.* at ¶ 95.)  And third, as to Mr. Unser, the court's analysis of Clark's claims against the individual defendants applies equally to her claims against Unser.  Therefore, the claims against these individuals—to the extent there are any—are dismissed.

356, 368-70 (2001), any claims for money damages being asserted against OSC under the ADEA or Title I of the ADA are dismissed.  CSEA, however, may remain amenable to suit under Title VII, the ADEA, and the ADA, notwithstanding the fact that it does not constitute an employer.  *See 14 Penn Plaza LLC v. Pyett*, 129 S.Ct. 1456, 1473 (2009); *Nweke v. Prudential Ins. Co. of Am.*, 25 F. Supp. 2d 203, 220 (S.D.N.Y. 1998).

## 2.    Related Pending Action

As the parties are well aware, and as the court has already noted, this action was preceded by a near-identical action filed by Clark in this court on June 23, 2009.  *See Clark v. N.Y. State Office of the State Comptroller*, No. 1:09-cv-716.  This earlier action names several of the same defendants, including OSC and CSEA.  (*See* 1:09-cv-716, Compl. ¶¶ 7-9, 12, 15, Dkt. No. 1.)  And in this pending action, Clark has alleged the same claims against OSC and CSEA under Title VII, the ADA, the ADEA, and the FMLA.  (*See id.* at 1-2, 23-27.)

Therefore, in light of the fact that Clark has essentially reasserted the same exact claims in the present action against defendants OSC and CSEA as those that have been asserted in the already pending action, the court dismisses from this action all remaining claims asserted against OSC

36

and CSEA under Title VII, the ADA, the ADEA, and the FMLA as improper and duplicative of the other action.[29]  Importantly though, the court's findings and rulings here are limited to the allegations made in this action alone, and such rulings do not supplant or abrogate any prior rulings made in the 1:09-cv-716 action.

**D.**   **State Law Claims**

The court declines to exercise supplemental jurisdiction over Clark's remaining state law claims.  Although a federal court has discretion to retain jurisdiction over state law claims after the dismissal of the federal claims that created original jurisdiction, "where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *Klein & Co. Futures, Inc. v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) (citation omitted); *see also* 28 U.S.C. § 1367(c)(3).

**E.**   **Motion to Strike**

Having reviewed both the materials submitted by defendants and Clark's request that such materials be stricken from the record as "intended

---

[29]Even if the court were able to piece together Clark's allegations regarding defendant Dominique to conclude that Dominique qualifies as an employer under the FMLA, Clark's FMLA claim against Dominique here would be subject to dismissal because the same exact claim is asserted against Dominique in the prior pending action.

to embarrass, harass, and intimidate," (Pl. Resp. Mem. of Law at 3-8, 13-15, Dkt. No. 33), the court discerns no substantive or evidentiary basis for Clark's request and therefore denies the request.  However, to the extent that any materials submitted by the parties cannot be deemed "integral" to the complaint,[30] the court has declined to consider them in ruling on the present motions.

## F.  **Motion to Amend**

Upon scouring Clark's response and giving due consideration to her status as a pro se litigant, it appears that she is requesting leave to amend her complaint as necessary.  (*See* Pl. Resp. Mem. of Law at 59, 93, Dkt. No. 33.)  However, in the additional 111 pages that she has submitted, Clark has failed to offer any additional factual allegations that would alter the court's conclusions.[31]  Rather, her submissions continue to center

---

[30]In ruling on a motion to dismiss, "the district court must limit itself to a consideration of the facts alleged on the face of the complaint and to any documents attached as exhibits or incorporated by reference."  *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (citations omitted).  Still, a document that is not incorporated by reference may nevertheless be considered "where the complaint relies heavily upon its terms and effect, which renders the document 'integral' to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks and citation omitted).

[31]Rule 15(a) provides that where a party seeks to amend his pleading before trial, "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "A motion to amend should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party."  *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (internal quotation marks and citation omitted).  "An amendment to a pleading will be futile if a proposed

around the § 72 hearings, which cannot presently form the basis for a viable action in this court.  It is also noteworthy that this present action seems to have been commenced largely in duplication of the already pending action—which, were it not for Clark's pro se status, could bear the imprimatur of bad faith.  Accordingly, Clark's request to amend her complaint is denied.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that CSEA's motion to dismiss (Dkt. No. 17) is **GRANTED** and CSEA is **DISMISSED** from this action; and it is further

**ORDERED** that Paul Zonderman's motion to dismiss (Dkt. No. 18) is **GRANTED** and Zonderman is **DISMISSED** from this action; and it is further

**ORDERED** that State defendants' motion to dismiss (Dkt. No. 20) is **GRANTED** and the remaining defendants are **DISMISSED** from this action; and it is further

**ORDERED** that Clark's complaint is **DISMISSED**; and it is further

---

claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead*, 282 F.3d 83, 88 (2d Cir. 2002) (citation omitted).  Accordingly, where the plaintiff submits a proposed amended complaint, "the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

**ORDERED** that Donna Clark's motions to strike and amend (Dkt. No.

33) are **DENIED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this

Memorandum-Decision and Order to the parties by regular and certified

mail.

**IT IS SO ORDERED.**

June 28, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge